# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 21-1553C
(Filed: June 30, 2022)

| | | |
|---|---|---|
| **AMERICAN MEDICAL EQUIPMENT, INC.** | ) | |
| | ) | |
| | ) | Breach of Supply Contract: |
| *Plaintiff,* | ) | Termination for Default; |
| | ) | Excusable Delay; |
| v. | ) | Implied Duty of Good Faith |
| | ) | & Fair Dealing |
| **UNITED STATES,** | ) | |
| | ) | |
| *Defendant.* | ) | |

*Eric S. Montalvo*, Federal Practice Group, Washington, DC, for plaintiff.  With him on the briefs was *Carol A. Thompson,* Federal Practice Group, Washington, DC.

*Alison S. Vicks*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant.  With her on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, Commercial Litigation Branch, U.S. Department of Justice, Washington, DC.  *Tracy Downing*, U.S. Department of Veterans Affairs, District Contract Law National Practice Group, *Of Counsel.*

## OPINION AND ORDER

***BONILLA, Judge.***

By January 2021, despite having "just 4% of the world's population," the United States had incurred "25% of the world's COVID-19 cases and 20% of all COVID-19 deaths."[1]  The nationwide emergency measures that started in 2020 continued into a second year to mitigate the impact of the pandemic amid the emergence of new virus variants and elevated records of hospitalizations.  This breach of contract action arose from the United States Department of Veteran

---

[1] *See National Strategy for the COVID-19 Response and Pandemic Preparedness* at 5 (Jan. 21, 2021), *available at* https://www.whitehouse.gov/wp-content/uploads/2021/01/National-Strategy-for-the-COVID-19-Response-and-Pandemic-Preparedness.pdf (last viewed June 27, 2022).

Affairs' (VA) efforts in early 2021 to acquire and stockpile personal protective equipment (PPE), i.e., nitrile examination gloves, to enable prompt delivery to medical personnel at VA healthcare facilities located throughout the country. Plaintiff, American Medical Equipment, Inc. (AME), bid for and was awarded a contract to supply the VA with 10 million nitrile examination gloves.  When AME failed to meet the 45-day delivery schedule specified in the contract, the VA terminated the contract for default.  AME brings this action challenging the contracting officer's decision and seeking to convert the termination for default into a termination for convenience and recover consequent monetary damages. Pending before the Court are the parties' cross-motions for summary judgment. For the reasons stated below, defendant's motion for summary judgment is GRANTED and plaintiff's cross-motion for summary judgment is DENIED.

## BACKGROUND

## I.   <u>Pre-Award Events and Contract Requirements</u>

In late 2020, "[b]ecause of increased demand caused by COVID 19 [sic] and a national shortage in the inventory and supply of nitrile examination gloves, the [VA] determined it would implement a plan to maintain a 180-day stock of nitrile examination gloves to ensure the availability of gloves for the Agency's healthcare providers." ECF 15-1 at 50.  To cover the agency's 1,244 healthcare facilities located throughout the United States, the VA determined that "hundreds of millions of nitrile examination gloves [were] required."  *Id.*

Between October 2020 and February 2021, the VA issued three solicitations for nitrile examination gloves.  *Id.* at 50–54.  "In order to ensure that the gloves would be provided quickly by the distributors, the solicitations . . . requested that the gloves be on-hand (or already in existence) so that delivery could be accomplished within 30-45 calendar days of contract award."  *Id.* at 50.  After reviewing the quotes received, between December 2020 and June 2021, the VA awarded a total of fifteen (15) contracts for the procurement of nitrile examination gloves, requiring quantities ranging from 2.5–50 million.  *Id.* at 50–54.  Awarding multiple contracts for smaller quantities of "on-hand" PPE was purposely done to ensure delivery would be accomplished within 30–45 calendar days of contract award.  *Id.* at 50, 53.

### A. <u>VA Solicitation</u>

On February 9, 2021, VA Contracting Officer Charles W. Worsham issued Solicitation No. 36C24921Q0115 for an unspecified quantity of nitrile examination gloves.  *Id.* at 57–116.  Under "Schedule of Supplies/Services," the first page of the solicitation states: "Delivery shall be 45 calendar days or sooner, after receipt of order."  *Id.* at 57.  Section B.2 of the solicitation, titled "Statement of Work,"

stressed to potential bidders that the supply contract was intended for on-hand gloves subject to a non-negotiable delivery schedule:

> This is *not a request for manufacturing but a request for quantity on hand to be delivered within 45 calendar days from order.*
>
> . . .
>
> Contracts that are awarded based on submitted quotes will have *45 calendar days* from receipt of order (award date) to deliver the awarded quantities, *or the contract will be terminated for cause* and negative performance will be reflected within the Contractor Performance Assessment Reporting System (CPARS) and the Federal Awardee Performance and Integrity Information System (FAPIIS).

*Id.* at 60 (emphases added); *see also id.* at 115 at Question No. 14 (PPE Source Questionnaire: "Quantity on hand (in-stock and available for immediate delivery)"). Under "Delivery Schedule" (Section B.4), the solicitation restates that the PPE must be delivered "45 calendar days after receipt of order" and further specifies the delivery location and instructions.  *Id.* at 63.

Section C.1 of the solicitation, titled "Contract Clauses . . . Contract Terms and Conditions—Commercial Items," incorporates pertinent provisions of the Federal Acquisition Regulation (FAR) governing commercial item acquisition.  *Id.* at 64–81.  Relevant here, among the FAR provisions quoted in the VA solicitation is FAR 52.212-4(f), which provides:

> *Excusable delays.*  The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers.  The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

ECF 15-1 at 64 (italics in original).  FAR 52.212-4(m), also incorporated and quoted in the VA solicitation, states:

> *Termination for cause.*  The Government may terminate this contract,
> or any part hereof, for cause in the event of any default by the
> Contractor, or if the Contractor fails to comply with any contract terms
> and conditions, or fails to provide the Government, upon request,
> with adequate assurances of future performance.  In the event of
> termination for cause, the Government shall not be liable to the
> Contractor for any amount for supplies or services not accepted,
> and the Contractor shall be liable to the Government for any and
> all rights and remedies provided by law.  If it is determined that
> the Government improperly terminated this contract for default,
> such termination shall be deemed a termination for convenience.

ECF 15-1 at 68 (italics in original).  Under other FAR provisions similarly
incorporated in the solicitation, the VA highlighted the importance of the strict
delivery schedule.  *See id.* at 87–88 (FAR Part 13 Simplified Acquisition Procedures:
Section F—Delivery Schedule: "The contractor shall submit a proposed delivery that
is not to exceed 45 calendar days."); ECF 15-1 at 94–95 (Subsection E.9 Evaluation
— Commercial Items (Tailored): "Delivery Schedule: To be eligible for award,
Offerors must be able to deliver within 45 calendar days from the award date.").

### B. <u>AME Offer</u>

On February 16, 2021, in response to the VA solicitation, AME submitted an
offer to provide 10 million nitrile examination gloves for $1.469 million.  ECF 11-1
at 107–226.  More specifically, AME committed to procure the 10 million nitrile
examination gloves from Chinese original equipment manufacturer (OEM) Hebei
Titans Hongsen Medical Technology Co. Ltd. (Titans Hongsen) and deliver them to
the specified United States Defense Logistics Agency (DLA) warehouse/distribution
center within 45 days after receipt of order.  *Id.* at 109, 112–13, 203, 226.  AME
holds itself out as a minority/woman-owned business, incorporated in 2006 and
located in Memphis, Tennessee; AME represents itself as an authorized reseller/
distributor of nitrile examination gloves manufactured by Titans Hongsen.  *Id.* at
203, 225.  Among the references AME listed in support of its bid was: Dennis J.
Stewart Sr., Bureau Director Logistics, Mississippi Emergency Management Agency
(MEMA).  *Id.* at 225.

In response to the PPE Source Questionnaire, AME responded, in part:

| Question | Contractor Response |
| --- | --- |
| . . . | . . . |
| 2. Has your company done business with the Federal government previously? If yes, please provide contract number for reference | NO |
| . . . | . . . |
| 6. Any unique terms and conditions being proposed | NO |

4

| . . . | . . . |
|---|---|
| 12. If already produced, where is product located now? | CHINA |
| . . . | . . . |
| 14. Quantity on hand (in-stock and available for immediate delivery) | Due to high demand ,nothing [sic] in hand. |
| . . . | . . . |
| 16. Provide summary of logistics chain (i.e. they are buying from the manufacture or are they buying from another wholesaler/importer and reselling again (how many hand exchanges before delivery)[)] | Buying direct from OEM to expedite delivery |

*Id.* at 204–06.  In the Delivery Schedule (Section B.4), for the two types of nitrile examination gloves AME offered, AME President Masooma Tiwana handwrote: "5.5 million" with a "Delivery Date" of "45 Days ARO [After Receipt of Order]"; and "4.5 million" with a "Delivery Date" of "45 Days ARO."  *Id.* at 226.

## C.  <u>Pre-Award Investigation and SBA Intervention</u>

On February 25, 2021, VA Contract Specialist Scott Dickey notified AME President Tiwana of certain VA concerns about AME's ability to successfully perform under the contract, citing a DNBi report assigning AME a Supplier Evaluation Risk Rating of "High Risk (9),"[2] and the fact that AME had "no procurement history with the federal government."  ECF 11-1 at 227.  AME responded the next day, explaining that the DNBi report was "based on outdated data" and highlighting AME's recent PPE supply contract with MEMA.  *Id.* at 246.  Addressing delivery logistics for its pending bid, AME represented: "We have already teamed up with Fedex [sic] to secure logistics supply chain for this contract ,if [sic] awarded.  They have already worked with us in our previous contract with MEMA."  *Id.*

In response to a February 25, 2021 reference check with MEMA, Mr. Stewart immediately offered:

> Sir it was not satisfactory.  Delays in shipment, billing issues.  They drove down from Memphis and tried to take some of the gowns for samples.  After I told them no, they went to the warehouse and tried to buy some gowns from our warehouse staff.  Bottom line I will not

---

[2] DNBi is an interactive web application that allows users possessing login credentials to access financial information, analytics, and credit worthiness about over 120 million companies in the Dun & Bradstreet Corporation database.  *See* https://sso.dnbi.com/cas/login?null&cnt=4 (last viewed June 28, 2022).

purchase from them again.  I have been buying all the [COVID-19]
PPE for the state and I will not use them again.

*Id.* at 252–53.  After reviewing AME's submission, and taking into account the
negative reference check, Contracting Officer Worsham determined AME to
be "non-responsible," explaining:

> After the contracting team reviewed AME's original submission and
> conducted reference checks, I determined AME to be non-responsible
> for the award because it did not have a satisfactory or better
> performance rating for supplying personal protective equipment (PPE)
> in a timely manner, as required by the solicitation.  AME did not
> have any experience in Federal contracting and the reference check
> it provided indicated that AME had not been able to deliver
> contracted-for PPE on the required performance schedule.

ECF 11-2 at 66 (Worsham Decl. ¶4).  Due to AME's small business status, in
accordance with the FAR, Contracting Officer Worsham requested a Certification
of Competency (COC) from the United States Small Business Administration (SBA).
*Id.* at 67 (Worsham Decl. ¶¶ 5–6); *see* ECF 11-1 at 258.  On April 6, 2021, the SBA
issued the requested COC, certifying that AME "is responsible to perform the
proposed procurement covered by the referenced Solicitation No. 36C249-21-Q-
0115."  ECF 11-1 at 262–65 (emphasis omitted).

In an email dated April 8, 2021, Contracting Officer Worsham notified AME
that the VA received the COC from the SBA and that all new PPE supply contract
awards were on hold pending further direction from VA leadership.  *Id.* at 266.
Nevertheless, the Contracting Officer continued: "We are not accepting glove
substitutions but if your pricing or qty available to be delivered within 45 calendar
days changes, please let us know."  *Id.*  AME immediately confirmed continued
interest "for the price and quantity already quoted."  *Id.*

A week later, on April 15, 2021, Contracting Officer Worsham reached out to
AME President Tiwana, inquiring:

> We have received the go ahead with additional awards for this
> solicitation.  Please confirm pricing and the qty of gloves that you can
> deliver within 45 calendar days.  Is it still 10M gloves at $0.1469 per
> glove (total $1.469M) or has it changed?
>
> Please note that this is not a notice for award.

*Id.* at 269.  AME immediately responded:

Pricing and quantity is re-confirmed i.e [sic] 10M gloves at $0.1469 per glove (total $1.469M) to be delivered in 45 days ARO.  Furthermore ,should [sic] you require additional quantity  over [sic] and above 10 million gloves at the same price ,please [sic] let us know.  We will be able to supply the same.

*Id.* at 268.

## II.  <u>Contract Award</u>

On April 16, 2021, the day after their most recent email exchange, Contracting Officer Worsham formally extended AME a notice of award stressing, among other things, the firm 45-day delivery deadline and the need for constant communication:

Prior to signing the [award] document, there are some items that need to be re-addressed and/or re-confirmed.  Due [to] recent past experiences, I want to overcommunicate these points.

. . .

2. The *delivery date is set for 07 June 2021 for 100% qty of gloves being awarded.  No extensions will be granted.  This includes* but is not limited to *delays associated with the manufacturer, the supplier, shipping delays, customs*, lack of financing and *the pandemic.*

. . .

5. Ensure to communicate with both the contracting office and the DLA warehouse personnel; including weekly updates to the contracting office.  Ensure communication with DLA is done well ahead of time for each and every shipment/delivery.

. . .

*Id.* at 271–72 (emphases added).  The remaining four points of emphasis included matching the gloves, pricing, and packaging AME included in its offer, and completing the necessary government accounting forms.  *Id.* at 271.  AME President Tiwana responded that she "comprehend[ed] and reconfirm[ed] the 6 points flagged in [the] communication," and submitted the signed award document several days later.  *Id.* at 271; ECF 11-2 at 1–24.

In the April 20, 2021 email returning the signed award document to AME, Contracting Officer Worsham again stressed:

7

> Please note that the period of performance start date in the price/cost schedule reflects today.  The delivery date remains at June 7th since it is still the next business day after 45 calendar days.  Please send regular updates to both [Contract Specialist Dickey] and myself and please ensure to contact the warehouse personnel well in advance to schedule delivery(ies).

ECF 11-2 at 25.  That evening, AME President Tiwana "acknowledge[d] the period of performance as communicated" and promised to provide "regular[] update[s]" as requested.  *Id.*

The fully executed PPE supply contract award includes the same "Statement of Work" (Section B.2), delivery schedule, and incorporated FAR provisions as those in the initial VA solicitation (Feb. 9, 2021) and AME's offer (Feb. 16, 2021) and is consistent with the pre-award communications between the VA Contracting Office and AME.  *Compare* ECF 11-2 at 1–24 (contract award) *with* ECF 15-1 at 57–116 (solicitation) *and* ECF 11-1 at 107–226 (AME offer).  Above AME's signature on the first page of the award document, the "Schedule of Supplies/Services" section states:

> This is an acquisition for surge supply of Nitrile Gloves for hospital staff in response to the increased usage caused by COVID-19. The contractor agrees to deliver the amount of supplies ordered in 45 calendar days from the execution of this contract.
>
> The No Later Than Delivery Date for entirety of order is 06/07/2021.

ECF 15-1 at 125.  Under "Statement of Work," the contract restates the on-hand requirement and the firm 45-day deadline:

> This is not a request for manufacturing but a request for quantity on hand to be delivered within 45 calendar [d]ays from order.
>
> . . .
>
> Contracts that are awarded based on submitted quotes will have 45 calendar days from receipt of order (award date) to deliver the awarded quantities, or the contract will be terminated for cause and negative performance will be reflected within the [CPARS] and the [FAPIIS].

*Id.* at 128.  Under "Delivery Requirements," the contract repeats that delivery is due "45 calendar days after receipt of order" to the DLA Distribution warehouse located in Chambersburg, Pennsylvania.  *Id.* at 129–30.

### III.   **Contract Performance**

AME provided updates to the VA for the first two weeks after the award. *See, e.g.*, ECF 11-2 at 33–34 (April 21, 2021 email from AME to VA: "Just a quick update[.]  I have placed the order with OEM and remitted funds to it."); *id.* at 33 (April 27, 2021 email from AME to VA: "Our production run had [sic] commenced and is likely to complete by April 29.").  Despite the somewhat ambiguous representation in its offer, AME's April 27, 2021 report makes clear that it ordered the manufacture of the 10 million nitrile examination gloves *post-award* rather than simply purchasing existing quantity for more immediate delivery.  *Compare* ECF 11-1 at 206 (AME responded "CHINA" to the solicitation PPE Source Questionnaire Question No. 12: "*If already produced*, where is product located now?")[3] (emphasis added) *and id.* (AME responded "Due to high demand ,*nothing* [sic] *in hand*." to Question No. 14: "Quantity on hand (in-stock and available for immediate delivery)") (emphasis added) *and id.* (AME responded "Buying direct from OEM to expedite delivery" to the Question No. 16: "Provide summary of logistics chain . . . .) *with* ECF 11-2 at 33–34 (quoted above) (AME statement of April 21, 2021 that it "ha[s] placed the order with OEM and remitted funds" and report of April 27, 2021 that "production" commenced).

Thereafter, on May 3-4, 2021, AME informed the VA that the PPE equipment was being delivered from China by container ships, in several batches, rather than by air or via FedEx.  *Compare* ECF 15-1 at 37 (May 3, 2021 email from AME to VA: "This is to update you on our Contract. 75% of the Contract shipment has been despatched [sic] from factory to port of origin in China .Remaining [sic] 25% goods will be despatched [sic] by tomorrow to the port.. [sic]") *and id.* at 36 (May 3, 2021 email from VA to AME: "Are these being shipped via air or container ships?") *and id.* at 35 (May 4, 2021 email from AME to VA: "All 10 million gloves packed in 4 containers are ready and are being shipped on container ship.") *with* ECF 11-1 at 246 (February 26, 2021 email from AME to VA: "We have already teamed up with Fedex [sic] to secure logistics supply chain for this contract ,if [sic] awarded.").  Nevertheless, AME's May 4, 2021 correspondence closed with the following assurance to the VA: "All is on track to have the gloves delivered by June 7th." ECF 15-1 at 35.

The record does not reflect further shipping or delivery updates from AME until May 25, 2021.  In response to Contract Specialist Dickey's May 24, 2021

---

[3] In response to the following question "Are you able to provide a letter from the manufacturer stating they will allocate a quantity to you as a distributor? *If so, provide letter with quote*[,]" AME stated "Auth letter indication [sic] quantity attached."  ECF 11-1 at 206 (emphasis in original). Rather than an allocated quantity available for AME's distribution, the attached letter from Titans Hongsen stated "[AME is] *authorized to quote* a quantity of 10 Million . . . for this project."  *Id.* at 203 (emphasis added).

request for an update, AME represented that the "entire production of 10 million nitrile gloves was completed on April 28" and

> The marine containers are expected to be in New York port  [sic] on June1.After [sic] necessary clearance these will be shipped to [the] delivery site within 3-4 days .We [sic] intend to coordinate with [the] delivery site as soon as shipments arrive at the port .i.e [sic] a week prior to delivery.

*Id.* at 18.  When the VA asked for another update on June 2, 2021—the day *after* the touted June 1, 2021 port arrival—AME reported that none of the containers arrived:

> The original ETA for all 4 containers was 06/01.  As per attached Arrival Notice received from shipping company ,ETA [sic] at New York Port is now 06/09.These [sic] will be 3 containers having 75% of the supply.  A 4th container which was loaded on the ship called "M.Y.Witness" [sic] on 04/29 and was expected along with these containers was off loaded [sic] at the last minute due to operational reasons cited by [the] shipping company and re-loaded on another ship on 05/22 as per [the] attached notice from the shipper [and] is now expected to arrive on 06/22.

*Id.* at 23.  Attached to AME's June 2, 2021 correspondence were several shipping documents.  *Id.* at 38–42.  These include: (1) three "Arrival Notice / Freight Invoice" forms from BNX Shipping Inc. documenting three containers were estimated to depart from Yantian, China (port of loading) "05/06/2021" and estimated to arrive at New York port (port of discharge) "06/09/2021"; and (2) a vessel notification email between two shipping companies (i.e., Ocean Network Express and Hecny Transportation (Shanghai)) showing a fourth container originally estimated to arrive at New York port "08 JUN 2021," but re-nominated to depart from Yantian port on "22 MAY 2021" to arrive at New York port "22 JUN 2021."  *Id.*

As of the June 7, 2021 contracted delivery date, AME delivered no gloves to the DLA warehouse/distribution center and, further, had not coordinated with the warehouse regarding any expected deliveries.  *See* ECF 11-2 at 61 (June 7, 2021 VA delivery tracking table listing AME status: "No advance delivery information received"); *id.* at 54–61 (June 7-8, 2021 internal VA emails confirming no AME deliveries received under the contract).

## IV.   Termination for Default

After reviewing the June 7, 2021 receipts, the delivery warehouse again confirmed that "nothing was delivered by [AME]."  *Id.* at 55.  On June 8, 2021, Contracting Officer Worsham terminated AME's contract, contract number

36C24921P0320, for cause for failing to meet the June 7, 2021 delivery deadline, and formally notified AME's President of the VA's decision. *Id.* at 63–65. The Termination for Cause notice explained:

> The contract was awarded on April 20th, thereby requiring 50M[4] nitrile gloves to be delivered by 07 June 2021, and [AME] delivered zero.

> The April 20th award stated:

>> Contracts that are awarded based on submitted quotes will have 45 calendar days (i.e. 07 June) to deliver the awarded quantities, or the contract will be terminated for cause and negative performance will be reflected within the [CPARS] and the [FAPIIS].

*See* ECF 11-2 at 65.

## V.   AME's Challenge to the Termination for Default

On July 7, 2021, AME commenced this action, alleging that the termination for default was arbitrary and capricious, and that the government breached its implied duty of good faith. *See* ECF 1 at 2, 5–9. In support of its claims, AME contends that the Contracting Officer should have exercised his discretion to extend the delivery deadline. *See* ECF 15 at 23–25. AME further argues that the shipping delays were due to a May 2021 COVID-19 outbreak in China restricting Yantian port operations and, thus, were excusable. *See* ECF 1 at 6–7. AME also avers that the default termination was not in the best interest of the government in that the consequent re-procurement further delayed the VA's receipt of the PPE. *Id.* at 4.

Defendant counters that the VA properly terminated the supply contract for cause because AME failed to perform. *See* ECF 11 at 1. The termination was further justified, defendant maintains, in light of AME's advance notice that it would not meet the June 7, 2021 deadline. *Id.* at 8. Defendant avers that AME's nonperformance was not excusable because AME's failure to meet the strict delivery schedule was caused by its choices to: contract for the manufacture of the nitrile examination gloves rather than locate and purchase existing PPE for prompt delivery; have the gloves manufactured in China rather than the United States; and import the gloves on container ships after representing to the VA that the company had made arrangements with FedEx. *Id.* at 27–28. Defendant further contends

---

[4] The reference to 50 million nitrile examination gloves is clearly a typographical error as the AME PPE supply contract involved the procurement and delivery of 10 million gloves. *Id.* at 66; ECF 11-1 at 6.

that the terms of the supply contract, which required delivery within 45 days or else risk default termination, were clear and repeatedly confirmed with AME.  *Id.* at 1.

## DISCUSSION

## I.   <u>Legal Standards</u>

### A.  <u>Cross-Motions for Summary Judgment</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  A "genuine dispute" exists where a reasonable factfinder "could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Material facts," in turn, are those "that might affect the outcome of the suit."  *Id.*  In deciding motions for summary judgment, particularly where, as here, the parties filed cross-motions for summary judgment, the Court must draw all inferences in the light most favorable to the nonmoving party, evaluating each motion on its own merits.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  That burden can be met by showing "there is an absence of evidence to support the nonmoving party's case."  *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence."  *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing *Anderson*, 477 U.S. at 248).  Summary judgment is warranted when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita*, 475 U.S. at 587.

### B.  <u>Termination for Default</u>

When a contractor challenges a termination for default, the government bears the initial burden to show the contractor was in default at the time of termination.  *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 763–65 (Fed. Cir. 1987).  For contracts concerning delivery of goods, "[a] contractor's failure to make timely delivery of agreed-upon goods establishes a prima facie [sic] case of default."  *Gen. Injectables & Vaccines, Inc. v. Gates*, 519 F.3d 1360, 1363 (Fed. Cir.), *opinion supplemented on denial of reh'g,* 527 F.3d 1375 (Fed. Cir. 2008).  Once default is established, "[t]he burden then shifts to the contractor to show that the failure to deliver the contract goods was excusable."  *Id.* (citing *DCX, Inc. v. Perry*,

79 F.3d 132, 134 (Fed. Cir. 1996)).  Under FAR 52.212-4(f), incorporated in AME's contract, the contractor's failure to timely deliver is excusable if it "is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence."

The Court reviews an agency's termination for default *de novo*.  41 U.S.C. § 7104(b)(4); *see also McDonnell Douglas Corp. (McDonnell Douglas II) v. United States*, 323 F.3d 1006, 1018 n.3 (Fed. Cir. 2003).  "In determining whether a default termination was justified, a court must review the evidence and circumstances surrounding the termination, and that assessment involves a consideration of factual and evidentiary issues."  *McDonnell Douglas II*, 323 F.3d at 1014 (citing cases).  As a general matter, government contracting officers have "broad discretion to determine whether to terminate a contract for default," and those decisions must be sustained unless they are "arbitrary, capricious, or an abuse of discretion." *Allen Eng'g Contractor Inc. v. United States*, 611 F. App'x 701, 705 (Fed. Cir. 2015) (quoting *Lanterman v. United States*, 75 Fed. Cl. 731, 733–34 (2007)).  Nevertheless, in reaching a default termination, a contracting officer must "make sure that termination is in the best interests of the Government."  *Nuclear Rsch. Corp. v. United States*, 814 F.2d 647, 649 (Fed. Cir. 1987); FAR § 12.403(b).  Further, there must be a nexus between the default termination and the contractor's performance. *See McDonnell Douglas Corp. (McDonnell Douglas I) v. United States*, 182 F.3d 1319, 1326 (Fed. Cir. 1999) ("[A] termination for default that is unrelated to contract performance is arbitrary and capricious, and thus an abuse of the contracting officer's discretion.") (citing *United States Fidelity & Guaranty Co. v. United States*, 676 F.2d 622, 630 (1982)).[5]

## II.   <u>Contract Performance: Default and Repudiation</u>

AME bid for and was awarded a contract with the VA to deliver 10 million nitrile examination gloves to a designated warehouse/distribution center in Pennsylvania by June 7, 2021, or else risk default termination.  Contrary to the clearly stated (and repeated) strict 45-day delivery schedule, AME delivered zero gloves to the VA on or before June 7, 2021.  In fact, as of the June 7, 2021 deadline, none of the four containers AME commissioned to import the PPE had even reached the United States, let alone cleared U.S. Customs and completed their drayage to the designated Pennsylvania warehouse/distribution center.  *See e.g.*, ECF 1 ¶ 11 (AME complaint conceding none of the containers would arrive at the New York port by June 7, 2021).  Accordingly, a *prima facie* case of default has been

---

[5] Citing *McDonnell Douglas I*, AME argues that the termination was an abuse of discretion because "there was no performance-based reason for default termination" and it was "pretextual."  ECF 15 at 24–25, 25 n.12.  AME's reliance upon this case is misplaced.  As discussed *infra*, contrary to AME's assertion, the Court finds that the Contracting Officer's decision to terminate for cause was directly related to contract performance: AME's failure to meet the clearly stated and agreed to strict delivery deadline.

established due to AME's "failure to make timely delivery of agreed-upon goods." *Gen. Injectables & Vaccines*, 519 F.3d at 1363; *see, e.g., Fin. & Realty Servs., LLC v. United States*, 128 Fed. Cl. 770, 777 (2016) ("As a general rule, 'the government is entitled to strict compliance with contract specifications.'") (quoting *TEG–Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1342 (Fed. Cir. 2006)).  Consistent with repeated pre-award confirmation with AME, and as provided in the initial solicitation and restated in the contract award itself, "the contract [was] terminated for cause" when AME failed to deliver any PPE by the contracted non-extendable deadline.  *See, e.g.*, ECF 15-1 at 128.

The immediacy of the termination is supported by AME's anticipatory repudiation.  According to the only shipping status documentation AME shared with the VA, three (of four) containers were estimated to arrive at the New York port on June 9, 2021, two days *after* the PPE was contractually required to be delivered to the Pennsylvania warehouse/distribution center; the fourth container was estimated to arrive at the New York port on June 22, 2021, fifteen days after the contracted delivery date.  *See* ECF 15-1 at 38–42.  By notifying the Contracting Officer five days before the contractual deadline that it could not deliver any of the 10 million nitrile examination gloves by June 7, 2021, AME effectively renunciated its "contractual duty *before* the time fixed in the contract for performance" which constituted a repudiation.  *Franconia Assocs. v. United States*, 536 U.S. 129, 130 (2002) (emphasis in original); Restatement (Second) of Contracts ("Restatement") § 250 (1981) ("[L]anguage that under a fair reading 'amounts to a statement of intention not to perform except on conditions which go beyond the contract' constitutes a repudiation.").  AME's anticipatory repudiation, accompanied by non-performance, "give[s] rise to a claim for total breach."  Restatement § 243(b).

AME questions whether the Contracting Officer's decision to terminate the contract was in the best interest of the government, arguing that re-procurement would take longer than awaiting AME's late delivery.  As an initial matter, in a related bid protest, the Government Accountability Office (GAO) rejected AME's argument that the VA's award of certain other PPE supply contracts under the same solicitation were unlawful re-procurements, finding that they "were made under the existing solicitation and were not re-procurements."  *The Noble Att'y, LLC; Am. Med. Equip., Inc.*, B-419884 et al., 2021 CPD ¶ 276, 2021 WL 3602132, at *4 (Comp. Gen. Aug. 2, 2021).[6]  Indeed, as detailed *supra*, rather than award one contract for the delivery of "hundreds of millions" of nitrile examination gloves, the VA purposely awarded a series of "smaller quantity" PPE delivery contracts under the same solicitation.  *See* ECF 15-1 at 50–54; *id.* at 94 (initial solicitation stating: "The Government intends to award one or more firm fixed price contracts resulting from this solicitation"); *see also* ECF 15-3 (Dickey Depo. Tr.) at 23

---

[6] AME acknowledges that "all contracts were issued under the same solicitations," thereby effectively conceding the additional contracts were not re-procurements. *See* ECF 15 at 35 n.18.

(VA awarded nine contracts under the solicitation); *id.* at 28 ("We were in a multiple award scenario situation. . . .   [E]ach offer was put through the same system and it was independent of the other offers.").  Such contracting effort increased the likelihood that any contractor's failure to perform would not impair the needs of VA medical staff.  *Id.* at 54 (commenting that "the VA [personnel] do have the gloves to support what they need" at the time of AME's contract was terminated).

Further, the VA's termination decision was based on AME's failure to deliver *any* PPE by the strict non-extendable deadline, which the VA repeatedly and unequivocally stressed to AME.  AME repeatedly and unequivocally agreed to these terms, likely because AME was expecting $366,000 in profit from the contract; properly characterized as a 33% return on investments in 45 days.[7]  The revelation that AME commissioned manufacture of the gloves post-award and shipped them by sea, in view of its ambiguous offer representation and contradictory pre-award assurance of partnership with FedEx, likely raised concern about AME's ability to produce from the onset of its performance.  Its repeated assurances—pre- and post-award—regarding its ability to comply with the June 7, 2021 delivery deadline went unrealized.  Despite agreeing to provide regular updates, AME only informed the VA of the purported May 2021 shipping delays five days before the contracted delivery date and only after the VA requested an additional update.[8]

AME's conduct during its performance up to the time of termination instilled in the VA Contracting Office little confidence that its claimed new delivery dates would materialize, and AME provided no assurance that they would.  *See* ECF 15-2 (Worsham Depo. Tr.) at 42 ("[T]he information [regarding the delay] came right before the delivery date, in my opinion.  So I do not believe they were open and honest from the get-go when it came to that issue."); ECF 15-3 (Dickey Depo. Tr.) at 71–72 ("I believe that there was discussions [sic] between the contracting officer and the vendor whether or not they could guarantee the delivery within two days and that was not able to be accomplished.  So, therefore, there was no two-day extension guarantee that the gloves would arrive on the vendor side, nor the contracting side."); *id.* at 77 ("[AME could] never guarantee the delivery date, the new delivery date"), *id.* at 79 ("If you look [at] the way [AME's email is] written, it says 'it's now expected to arrive.'  There's no will, shall, or must arrive. . . .  I believe there was other [sic] discussions other than this that they could not guarantee the 6-22 date.").  The VA's concerns about the materialization of the claimed new delivery dates were validated when, as it turned out, none of the four containers arrived on the dates

---

[7] Quoting the VA $1.469 million for the supply contract, AME claims it paid a total of $1,103,500 "for the gloves and shipment of the gloves."  ECF 1 ¶ 11.

[8] Given the firm 45-day deadline and AME's commitment to provide weekly updates, at a minimum, AME should have monitored and confirmed, in early May 2021 (i.e., the time of purported delay) whether and when its commissioned ships left the Chinese port.

AME represented in its June 2, 2021 email to the VA or its argument to the Court.[9]

"Well-established precedent holds that the government is entitled to strict compliance when it contracts for goods." *Hannon Elec. Co. v. United States*, 31 Fed. Cl. 135, 147 (1994), *aff'd*, 52 F.3d 343 (Fed. Cir. 1995). Allowing a contractor to unilaterally modify an essential and repeatedly confirmed contract term after-the-fact with little assurance for future delivery, however desirable it may be to the contractor, does not the serve the best interests of the government. Based on AME's record of conduct and ultimate failure to deliver any PPE by the established delivery date, the Contracting Officer consulted the procurement team and legal counsel and "determined terminating AME's contract was in the best interest of the Government." ECF 11-2 at 67–68 (Worsham Decl. at ¶¶ 8–15); *see* ECF 15-2 (Worsham Depo. Tr.) at 41; *accord* ECF 15-3 (Dickey Depo. Tr.) at 54 ("[I]t is in the government's interest, when there's an agreement made between a contractor and the government, that the government gets what is intended from the contract."). The circumstances surrounding AME's (non)performance, discussed *supra*, supports the Contracting Officer's determination. *See Nuclear Rsch. Corp.*, 814 F.2d at 650–651 (finding default termination proper where the factual circumstances support contracting officer's informed decision that termination would be in best interest of the government).

## III.   <u>Claims of Excusable Delay</u>

AME asserts that its nonperformance was excusable because the primary cause was "global and industry-wide shipping delays" due to a sudden COVID-19 outbreak restricting operations at the loading port in China. AME further claims that the contract did not forbid sourcing the PPE abroad and that the VA cannot reasonably rely upon a strict definition of "on hand" under the contract. In opting to procure post-award manufacture of the 10 million nitrile examination gloves from a Chinese OEM and then import them by container ship, however, AME alone bore the risk of both additional delays and failing to meet the strict delivery deadline.

### A.   <u>"On Hand" Gloves and 45-Day Delivery</u>

Against the backdrop of the rampant spread of COVID-19 and increasing PPE demand in VA healthcare facilities nationwide, the VA issued the solicitation at issue for "on-hand (or already in existence)" nitrile examination gloves available for delivery within 45 days. *See* ECF 15-1 at 50; ECF 15-3 (Dickey Depo. Tr.) at 34 ("we were very specific in [the] solicitation" that it was "a request for on-hand gloves, not manufactured gloves); *Orsa Techs., LLC v. DVA*, CBCA 7141, 22-1 BCA

---

[9] According to the container tracking information, available on https://ct.shipmentlink.com/servlet/TDB1_CargoTracking.do and https://ecomm.one-line.com/one-ecom/manage-shipment/cargo-tracking?trakNoParam (searchable by B/L or Booking number), AME's commissioned containers arrived at the New York port respectively on June 12, 13, 14, and 25, 2021.

¶ 38,025, 2022 WL 179215 (Jan. 18, 2022) ("The Government issued a solicitation designed to obtain that safety equipment as quickly as possible, attempting to guarantee fast delivery by limiting competition to contractors with those materials 'on hand' and 'in-stock,' with delivery of that 'on hand' safety equipment to be made within forty-five days after contract award."). Stressing the importance of meeting the 45-day delivery deadline, the VA solicitation forewarned all potential contractors, including AME, that the strict deadline would serve as an eligibility requirement and that failure to meet the specified delivery deadline would result in termination for default. ECF 15-1 at 95 ("Delivery Schedule: To be eligible for award, Offerors must be able to deliver within 45 calendar days from the award date."); *id.* at 60 ("Contracts that are awarded based on submitted quotes will have 45 calendar days from receipt of order (award date) to deliver the awarded quantities, *or the contract will be terminated for cause . . . .*") (emphasis added).

Reiterating these unequivocal contract terms, the Statement of Work memorialized in AME's contract award restates: "This is not a request for manufacturing but a request for quantity on hand to be delivered within 45 calendar days from order." *See id.* (solicitation); *id.* at 128 (award); ECF 15-3 (Dickey Depo. Tr.) at 62–63 ("that language was put into the solicitation and the contract . . . for the vendor's benefit to know the ramifications of not meeting the contract."). Moreover, throughout the solicitation and contract award process and during the contract performance period, the VA reminded AME of the strict delivery deadline. *See, e.g.*, ECF 11-1 at 271 ("The delivery date is set for 07 June 2021 for 100% qty of gloves being awarded. No extensions will be granted. This includes but is not limited to delays associated with the manufacturer, the supplier, shipping delays, customs, lack of financing and the pandemic."); *see also id.* at 266, 268–69; ECF 11-2 at 25; ECF 15-1 at 36. Fully aware from the outset of the firm 45-day delivery deadline and the risk of default termination, AME submitted an offer and, thereafter, repeatedly assured the VA that the strict deadline would be met. *See, e.g.*, ECF 11-1 at 226, 266, 268, 271; ECF 11-2 at 25; ECF 15-1 at 25–26, 35.

At bottom, in awarding AME the PPE supply contract, the VA made clear that the government was seeking delivery of 10 million nitrile examination gloves to its warehouse/distribution center within 45 days of award; the government was not soliciting a manufacturing contract (or subcontract) or entertaining a contractor unwilling or unable to comply with the strict deadline and banking on obtaining an extension. AME accepted the contract award under these terms: deliver the required PPE within 45 days or face termination for default. That the contract did not expressly prohibit AME from procuring the PPE from an overseas manufacturer and awaiting award of the government contract before ordering production of the gloves does not excuse AME's failure to meet the 45-day delivery deadline or justify its demand for extension. To find otherwise would empower AME to unilaterally modify a critical contract term after-the-fact despite the VA's unwavering position on the issue from the outset. It would also force the government to bear the burden

of the calculated risks AME accepted in opting not to locate a manufacturer or supplier with existing inventory or, at a minimum, a domestic manufacturer or supplier.

## B. **Shipping Delays**

Citing the "excusable delays" clause of the contract, ECF 15-1 at 132, AME asserts that the container shipping delays amid the global pandemic merited an extension of contract performance. By its terms, however, FAR 52.212-4(f) is not triggered where the contractor or its subcontractor bears responsibility for the delay.[10] *Gen. Injectables & Vaccines*, 519 F.3d at 1365. Here, as explained *supra*, AME elected to take the calculated risk of procuring the PPE from an overseas manufacturer and awaiting award of the government contract before ordering production of the gloves. Consequently, AME alone bears the fault for burning the initial two-week period (out of 45 days) attributed to manufacturing before placing the PPE in shipment (i.e., April 20 to May 4, 2021). *Compare* ECF 11-2 at 25 (April 20, 2021 supply contract award) *with id.* at 33 (AME representation that production of the 10 million gloves was to be completed by April 29, 2021) *and* ECF 15-1 at 17 (May 3, 2021 AME representation that 75% of the required PPE supply was sent to the port of origin in China, with the remaining PPE scheduled to be sent to the port on May 4, 2021).

Further, to bolster its pre-award assertion that the PPE delivery would be timely, on February 26, 2021, AME represented to the VA that it had arranged to transport the gloves with FedEx. ECF 11-1 at 246. On May 4, 2021, two weeks into contract performance, AME revealed that the PPE would be transported via container ship and not FedEx. ECF 11-2 at 37. No explanation was provided for the change in carrier or mode of transport, and nothing in the record supports the counterintuitive notion that importation to the United States from China is faster by sea than by air.[11] Regardless, as with AME's decision to manufacture post-award, AME alone bears the calculated risks—and the negative consequences of

---

[10] The parties dispute whether or not BNX, the shipping company AME commissioned, qualifies as a "common carrier" under FAR 52.212-4(f) or is AME's subcontractor. *Compare* ECF 11 at 39 n.7 *with* ECF 15 at 18–19, 19 n.10. While the record does not include sufficient information to enable a conclusive determination, the Court notes the "common carrier" designation is not dispositive and does not affect the inexcusability analysis and conclusion herein.

[11] Even if AME had intended to use FedEx's ocean cargo services, the initial impression made on the VA appears to be FedEx shipment via air. *See* ECF 11-1 at 246 (February 26, 2021 email from AME to VA: "We have already teamed up with Fedex [sic] to secure logistics supply chain for this contract ,if [sic] awarded."); ECF 11-2 at 37–38 (May 3, 2021 email from VA to AME: "Are these being shipped via air or container ships?"). AME claims, in a footnote, that "AME utilized container ships because it was faster than the timeline presented by Fedex [sic]." ECF 24 at 14 n.3. AME cites no support for its assertion and the Court finds no corroborative evidence in the record.

any resulting delays—attributable to its decision to import the PPE by container ship rather than FedEx.

AME maintains that all four shipping containers were originally scheduled to arrive at the destination port in New York on June 1, 2021, but were delayed because of unspecified COVID-19 related restrictions at the loading port in China. *See* ECF 15-1 at 18, 23. Aside from AME's May 25, and June 2, 2021 unsupported representations to the VA, nothing in the record corroborates these assertions. On the contrary, the "Arrival Notice[s] / Freight Invoice[s]" and other shipping notification AME shared with the VA suggest otherwise. For three of the four shipping containers, the documentation lists May 6, 2021, as the estimated time of departure (ETD) from Yantian, China, and June 9, 2021, as the estimated time of arrival (ETA) in New York, New York. *Id.* at 38–40. As for the fourth shipping container—clearly delayed—the Change of Vessel Notification lists May 6, 2021, as the original ETD from Yantian and June 8, 2021, as the ETA in New York; the re-nominated dates listed are May 22, 2021 (ETD Yantian) and June 22, 2021 (ETA New York). *Id.* at 41–42. These dates align with AME's May 3, 2021 report of the four containers being sent to the loading port by May 4, 2021; and no evidence in the record indicates an earlier ETA. Based upon the record presented, the Court finds that AME's contracted supply of 10 million nitrile examination gloves were never scheduled to arrive at the designated DLA warehouse/distribution center in Pennsylvania on or before the June 7, 2021 delivery deadline.[12]

Despite having agreed to provide "weekly updates" to the VA Contracting Office, *see* ECF 11-1 at 271, AME did not reveal the alleged early May 2021 shipping delays until June 2, 2021, after the VA requested an update from them; the update revealing the containers would *not arrive* in time came one day *after* the date AME represented to the VA that the four containers were *scheduled to arrive* in New York. *See* ECF 15-1 at 23. AME's failure to secure and share more timely delivery updates during the period of contract performance does not support a finding that AME was "without . . . fault or negligence." *Gen. Injectables & Vaccines*, 519 F.3d at 1363 (citing FAR 52.212-4(f)). A contractor's mere reference

---

[12] The specific shipping documentation included in the record, cited above, trumps AME's current citation to general reports and media coverage regarding the overall impact of the pandemic on the global shipping industry and Chinese ports throughout 2020 and into 2021. By the time the April 20, 2021 PPE supply contract was awarded—over a year into the pandemic—AME should have considered the possibility of COVID-19-related and transatlantic shipping delays before committing to manufacture 10 million nitrile examination gloves in China, then transport them by sea, then get them through U.S. Customs, and then drayage to a designated warehouse/distribution center in the United States within 45 days; especially considering AME was warned in an April 16, 2021 email from Contracting Officer Worsham that no extensions would be granted due to delays associated with the pandemic. *See* ECF 11-1 at 271; *Orsa Techs., LLC*, CBCA 7141, 22-1 BCA ¶ 38,025 ("Because [the contractor] was well aware of the pandemic when it executed the contract at issue and was supposed to have had the gloves 'on hand' when it entered the contract, it cannot use the pandemic as a cause of excusable delay.").

to a listed event under FAR 52.212-4(f) (e.g., delays of common carriers, quarantine restrictions) does not automatically excuse noncompliance particularly where, as here, the contractor accepted calculated risks of delayed delivery and opted to arrange supply of the PPE the way it did. *See United States v. Brooks-Callaway Co.*, 318 U.S. 120, 124 (1943) ("If fire is always an excuse, a contractor is free to use inflammable materials in a tinder-box factory and escape any damages for delay due to a resulting fire."). Based on the facts presented, excusing AME's untimely performance would "mak[e] the time fixed for completion practically meaningless and depriv[e] the Government of all recompense for the delay." *Id.*

For these reasons, the Court finds that AME has not met its shifted burden of demonstrating that its failure to timely perform under the PPE supply contract was excusable.

## IV.  <u>Implied Duty of Good Faith & Fair Dealing</u>

Finally, AME argues that, by not extending the contract deadline to allow AME's late delivery, the government violated its implied duty of good faith and fair dealing.  "The duty of good faith and fair dealing is inherent in every contract. In essence, this duty requires a party to not interfere with another party's rights under the contract." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 828 (Fed. Cir. 2010) (citing Restatement § 205).  As explained by the Federal Circuit:

> Cases in which the government has been found to violate the implied duty of good faith and fair dealing typically involve some variation on the old bait-and-switch.  First, the government enters into a contract that awards a significant benefit in exchange for consideration.  Then, the government eliminates or rescinds that contractual provision or benefit through a subsequent action directed at the existing contract. The government may be liable for damages when the subsequent government action is specifically designed to reappropriate the benefits the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract.

*Id.* at 829 (internal citations omitted).  What the precise duty of good faith and fair dealing entails in a particular case "depends in part on what that contract promises (or disclaims)." *Id.* at 830.

In this case, as discussed *supra*, the express language of the PPE supply contract, fully supported by the parties' pre- and post-award communications, makes clear that the 45-day delivery deadline was firm, that no extensions would be granted, and that AME's failure to meet the contractual deadline would result in a termination for cause. Accordingly, as in *Precision Pine & Timber, Inc.*, "[t]here are no . . . indicia of a governmental bait-and-switch or double crossing at work here."

20

*Id.* at 829.  In terminating AME's contract, the VA Contracting Office did not "specifically target" AME, nor did it "reappropriate any 'benefit' guaranteed by the contract[]."  *Id.*  The contract did not guarantee that extensions of time would be granted (and in fact stressed the opposite) and did not insulate AME from the consequences of the calculated risks it took in performing under the contract.

Put simply, the "implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions."  *Metcalf Const. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) (quoting *Precision Pine & Timber, Inc.*, 596 F.3d at 831).  AME accepted the unequivocal terms to deliver 10 million nitrile examination gloves to the designated DLA warehouse/distribution center within the strict 45-day deadline in exchange for an expected $366,000 profit, or else risk default termination.  The implied duty of good faith and fair dealing, "limited by the original bargain," does not justify modifying the terms as AME now wishes, allowing AME to reap the benefit of the bargain while insulating it from the consequences of the calculated risks the company undertook in executing contract performance.  *Id.* (implied duty of good faith cannot "alter[] the contract's discernible allocation of risks and benefits" or "conflict[] with a contract provision.").[13]  The Court finds that the government did not breach its implied duty of good faith and fair dealing.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment (ECF 11) is **GRANTED** and plaintiff's cross-motion for summary judgment (ECF 15) is **DENIED**.  The Clerk is directed to **ENTER** judgment accordingly.

**IT IS SO ORDERED.**

Armando O. Bonilla
Judge

---

[13] In further support of this argument, AME reiterates its contention that termination was not in the best interest of the government.  ECF 15 at 34 n.17.  For the reasons stated *supra*, the Court finds that argument unpersuasive.